# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JACKSON LEHR, and DAVID BEVVINO-BERV, individually and derivatively, on behalf of APP MANAGEMENT HOLDCO LLC, MICHAEL LEHR and ENKELKINDER SOLAR TRUST, <br><br> Plaintiffs, <br><br> v. <br><br> ASPEN POWER PARTNERS LLC, JORGE VARGAS and SCOTT DELANEY, <br><br> Defendants, <br><br> and <br><br> APP MANAGEMENT HOLDCO LLC, a Delaware limited liability company, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2025-0116-LWW |

## MEMORANDUM OPINION

Date Submitted: December 9, 2025
Date Decided: March 30, 2026

Paul D. Brown, Joseph B. Cicero, Ryan M. Lindsay, Samantha Callejas, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; *Attorneys for Plaintiffs Jackson Lehr, David Bevvino-Berv, Michael Lehr, and Enkelkinder Solar Trust*

Michael A. Barlow, Hayden J. Driscoll, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael B. Carlinsky, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Keith H. Forst, Maia Livengood, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C.; *Attorneys for Defendants Aspen Power Partners LLC, Jorge Vargas, and Scott Delaney and Nominal Defendant APP Management HoldCo LLC*

David E. Ross, Garrett B. Moritz, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Kathy D. Patrick, Sam W. Cruse, III, Sydney Ballesteros, Michael D. Doman, GIBBS & BRUNS LLP, Houston, Texas; *Attorneys for Intervenor-Plaintiff Carlyle Hunt HoldCo, L.L.C.*

**WILL, Vice Chancellor**

This dispute centers on the governance and economic restructuring of Aspen Power Partners LLC after a major capital infusion by a private equity sponsor. Displeased with the restructuring, early investors filed this lawsuit challenging the adoption of an amended limited liability company agreement that purportedly impairs their rights.

The plaintiffs' claims implicate two entities' limited liability company agreements and fall into two groups: direct claims by holders of Class B units, and derivative claims on behalf of a holding vehicle that owns Class A units. The Class B plaintiffs bring direct claims against Aspen Power, alleging its amended agreement was adopted in breach of their consent rights under the predecessor agreement. They also challenge the resulting composition of the board under 6 *Del. C.* § 18-110. The Class A plaintiffs advance derivative claims on the holding vehicle's behalf, accusing two managers of breaching their fiduciary duties and that vehicle's limited liability company agreement by approving the transaction.

The defendants' motion to dismiss the lawsuit is largely granted. The Class A plaintiffs lack standing to pursue the derivative claims, which otherwise fail on the merits because the individual defendants contractually waived fiduciary duties and were acting in a separate corporate capacity. The statutory governance claim is also dismissed.

1

The motion is denied as to two narrow aspects of the Class B plaintiffs' breach of contract claims. At the pleading stage, it is reasonably conceivable that the Fifth LLC Agreement adversely modified the plaintiffs' preemptive rights and economic distribution hurdles without their prior written consent. Those limited theories survive.

## I.    BACKGROUND

The following facts are drawn from the Verified Amended Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.    Aspen Power and APP Management

Defendant Aspen Power Partners LLC ("Aspen Power") is a renewable energy company.[2] It was founded in 2020 by plaintiff Jackson Lehr ("J. Lehr") and defendant Jorge Vargas.[3]

Aspen Power has four classes of membership units: Class A Units, Class B-1 Units, Class C Units, and Preferred Units.[4]

---

[1] Am. Verified Compl. (Dkt. 46) ("Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citation omitted)); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (stating that the court can take judicial notice of "facts that are not subject to reasonable dispute" (citation omitted)).

[2] Am. Compl. ¶ 1.

[3] *Id.*

[4] *Id.* ¶ 39.

Plaintiff Michael Lehr ("M. Lehr"), the father of J. Lehr, was a Class B-1 Unit holder alongside plaintiff Enkelkinder Solar Trust, a grantor trust he established for the benefit of his grandchildren.[5] Together, M. Lehr and the trust are the "Class B Plaintiffs."

Most of Aspen Power's Class A Units were initially held by nominal defendant APP Management HoldCo LLC ("APP Management"), an entity created for the sole purpose of holding those units.[6] APP Management had five members: J. Lehr, plaintiff David Bevvino-Berv (with J. Lehr, the "Class A Plaintiffs"), Vargas, defendant Scott Delaney, and non-party Daniel Gulick.[7] The entity was designed to "pass along to each of its Members such rights, as each such Member would have if such Member directly owned" the Class A Units.[8]

APP Management was governed by the APP Management HoldCo LLC Limited Liability Company Agreement ("APP Management LLC Agreement").[9] Under that agreement, majority member approval was required to effectuate ordinary decisions.[10] But the unanimous approval of all APP Management members

---

[5] *Id.* ¶¶ 33-34.

[6] *Id.* ¶ 38.

[7] *Id.* ¶ 2. APP Management is a member-managed limited liability company. *Id.* ¶ 5.5.

[8] *Id.* at Ex. C ("APP Management LLC Agreement") Recitals.

[9] *Id.*

[10] Am. Compl. ¶ 5.

was required to "grant any consent or the waiving or exercising of any rights under the [Aspen Power] Operating Agreement."[11]

## B. The Aspen Fourth LLC Agreement

Aspen Power's limited liability company agreement was amended three times to account for its growth and evolving needs.[12] On September 29, 2022, the Fourth Amended and Restated Limited Liability Company Agreement (the "Aspen Fourth LLC Agreement") took effect.[13] The amendments were designed, in part, to admit Carlyle Hunt HoldCo, L.L.C. ("Carlyle"), an affiliate of The Carlyle Group, as a member of Aspen Power.[14] After the Aspen Fourth LLC Agreement was executed, Carlyle contributed $200 million in exchange for Preferred Units.[15]

Under the Aspen Fourth LLC Agreement, Aspen Power's management was exclusively delegated to a seven-member board of managers (the "Board").[16] APP Management held the unilateral right to designate four managers, Carlyle had the right to designate one, and Ultra Capital—a Class B member—designated one.[17]

---

[11] APP Management LLC Agreement § 5.5(i).

[12] Am. Compl. ¶ 9.

[13] Am. Compl. Ex. A ("Aspen Fourth LLC Agreement").

[14] Am. Compl. ¶ 9.

[15] *Id.*

[16] *Id.* ¶¶ 46-47.

[17] Aspen Fourth LLC Agreement § 5.2(a)(i).

4

The seventh—an independent manager—was designated by the mutual selection of Carlyle and APP Management.[18] As of December 2024, the Board was composed of: Vargas, Delaney, Bill DeLong, and Peter Sherk (APP Management designees); Saurabh Anand (Carlyle designee); Kristian Hanelt (Ultra Capital designee); and Barry Welch (jointly designated).[19]

The Aspen Fourth LLC Agreement addressed the process to amend it. Under Section 14.2, the agreement could "only be amended, amended and restated, modified or otherwise supplemented . . . with the consent of [Carlyle] and upon the unanimous approval of the Board."[20] In addition, the "prior written consent of an affected Member (or class of Members)" was required if an amendment would:

- "alter the interest of a Member in Company Distributions, other than as a result of the admission or withdrawal of a Member, or issuance or Transfer of any Equity Securities";

- "adversely and disproportionately affect the rights or obligations of any class vis-à-vis the rights or obligations of any other class"; or

- "adversely modify or waive the preemptive rights" of any member.[21]

---

[18] *Id.*

[19] Am. Compl. ¶ 101.

[20] Aspen Fourth LLC Agreement § 14.2; Am. Compl. ¶¶ 96-97 (explaining that Carlyle was the "Investor Majority").

[21] Aspen Fourth LLC Agreement § 14.2.

## C. The Amendment Process

At the close of December 2024, Aspen Power management took steps to amend the Aspen Fourth LLC Agreement.

On December 11, 2024, Vargas—then Aspen Power's CEO—emailed members to notify them of an intention to amend the Aspen Fourth LLC Agreement.[22] He asked that members be prepared to execute the proposed amendment two days later, promising to send a "near-final" draft in short order.[23]

Counsel for Aspen Power circulated a draft on December 12. Various plaintiffs (J. Lehr, Bevvino-Berv, and M. Lehr) felt the draft had material errors and omissions.[24] They protested the timeline and asked for a revised draft.[25] The initial approval deadline was pushed back and revisions were made.[26]

At 2:30 a.m. on December 24, a new draft was circulated.[27] Counsel for Aspen Power described the changes as "limited modifications . . . that [would]

---

[22] Am. Compl. ¶ 54.

[23] *Id.*

[24] *Id.* ¶ 55.

[25] *Id.* ¶ 56.

[26] *Id.* ¶¶ 57-58.

[27] *Id.* ¶ 61.

6

simplify the approval process for [an upcoming] equity raise."[28]   The email

summarized the proposed amendments, including terms:

- allowing Carlyle to appoint four managers and allocating it a "sufficient number of votes to control the [B]oard";

- affording members preemptive rights for future issuances but providing that signing the amended agreement would waive those rights as to the upcoming capital raise; and

- creating new "Upside Preferred Units" and "Phantom Preferred Units" for issuance to management.[29]

Counsel explained that Aspen Power intended to finalize the amendment "before

Christmas."[30]

At 10:10 p.m. on December 24, M. Lehr told Aspen Power's counsel that he

"d[id] not approve this transaction."[31]   He also expressed concerns about approval,

writing: "It appears that your position is that my approval is not required.  To avoid

any misunderstanding, I think that your position violates the current governing LLC

[Agreement]."[32]   J. Lehr and Bevvino-Berv sent emails expressing the same

sentiment.[33]

---

[28] *Id.*; *see* Am. Compl. Ex. F (email summarizing the proposed amendments).

[29] Am. Compl. Ex. F.

[30] Am. Compl. ¶ 64.

[31] *Id.* ¶ 65 (quoting Am. Compl. Ex. F).

[32] *Id.*

[33] *Id.*

### D. The Aspen Fifth LLC Agreement

Despite these objections, the Fifth Amended and Restated Limited Liability Company Agreement (the "Aspen Fifth LLC Agreement") was executed later that night, pursuant to a unanimous written consent of the Board.[34] APP Management did not consent to the amendments.[35] A copy of the executed Aspen Fifth LLC Agreement was distributed to the plaintiffs on December 28, 2024 at 11:23 p.m.[36]

The Aspen Fifth LLC Agreement made several substantive changes to Aspen Power's governance and economics.

First, it changed the Board composition, increasing the Board from seven to ten managers.[37] Carlyle was given the right to appoint four managers, each with four votes on all matters.[38] All other managers retained one vote each.[39] The Aspen Fifth LLC Agreement also permitted a single Carlyle-appointed manager to cast up to sixteen votes in the case of vacancies.[40] As a result, control of the Board was transferred from APP Management to Carlyle.[41]

---

[34] *Id.* ¶ 66; *see* Am. Compl. Ex. B ("Aspen Fifth LLC Agreement").

[35] Am. Compl. ¶ 66.

[36] *Id.*

[37] *Id.* ¶ 71.

[38] *Id.* ¶ 100.

[39] *Id.* ¶ 72.

[40] *Id.* (describing Section 5.3 of the Aspen Fifth LLC Agreement).

[41] Am. Compl. Ex. F.

Second, it eliminated APP Management's "consulting rights" and transferred its "drag-along rights" to Carlyle.[42]

Third, it created Phantom Preferred Units ("PPUs").[43] An attached term sheet stated that the PPUs were "not equity interests[,]" and that "an award of [PPUs] shall not by itself in any way entitle the recipient thereof to any rights as an equityholder of the Company[.]"[44]

Fourth, it modified the "MOIC Uplift" schedule.[45] Under the Aspen Fourth LLC Agreement's distribution waterfall, Carlyle—as the sole Preferred Unit holder—was entitled to a return based on its outstanding capital contributions against a set multiplier that increased annually.[46] The Aspen Fifth LLC Agreement changed this multiplier schedule to increase quarterly rather than yearly.[47]

Finally, it altered members' preemptive rights. The Aspen Fourth LLC Agreement gave members the right to purchase a proportional share when new securities were issued by Aspen Power.[48] This preemptive right was not invoked

---

[42] Am. Compl. ¶ 74.

[43] *Id.* ¶ 76.

[44] Am. Compl. Ex. B at Ex. F at 5.

[45] *See id.* at Ex. D (setting out the MOIC Uplift schedule). "MOIC" stands for "multiple on invested capital."

[46] Am. Compl. ¶ 79; *see* Aspen Fourth LLC Agreement § 4.1; *id.* at Ex. D.

[47] Am. Compl. ¶ 78.

[48] Aspen Fourth LLC Agreement § 3.1(f)(i).

when "Excluded Securities" were at issue.[49]  Under the Aspen Fifth LLC Agreement, however, the definition of "Excluded Securities" was expanded.[50]  The Aspen Fifth LLC Agreement also waived all preemptive rights to "Effective Date Related Issuances" upon its execution.[51]

### E.    This Litigation

The plaintiffs filed this lawsuit on January 31, 2025.[52]  The operative amended Complaint, filed on May 15, advances direct and derivative claims for: breach of contract (Counts IV, V, VI, and VIII); breach of fiduciary duty (Count VII); and breach of the implied covenant of good faith and fair dealing (Count IX).[53]  The plaintiffs also seek declaratory judgments regarding the invalidity of the Aspen Fifth LLC Agreement, the legal composition of the Board, and the extent to which their approvals were required to amend the Aspen Fourth LLC Agreement (Counts I, II, and III).[54]

---

[49] *Id.*

[50] Am. Compl. ¶ 81 (comparing Am. Compl. Ex. B § 3.1, with Am. Compl. Ex. J at 11-12).

[51] *Id.*; Aspen Fifth LLC Agreement, Definitions (defining "Effective Date Related Issuances").

[52] Verified Compl. (Dkt. 1).

[53] Am. Compl. ¶¶ 162-78 (breach of contract); *id.* ¶¶ 179-86 (breach of fiduciary duty); *id.* ¶¶ 187-96 (breach of contract); *id.* ¶¶ 197-209 (implied covenant).

[54] *Id.* ¶¶ 127-61.

On February 17, 2025, Carlyle filed a motion to intervene pursuant to Court of Chancery Rule 24.[55]  That motion was unopposed and subsequently granted.[56] Carlyle filed an intervenor complaint on March 3, 2025, seeking a declaration that the Aspen Fifth LLC Agreement governs.[57]

On July 14, the defendants moved to dismiss the Complaint and filed an opening brief in support.[58]  Briefing was complete as of September 18.[59]  Oral argument took place on December 9, and the matter was taken under advisement.[60]

## II.  ANALYSIS

The defendants move for dismissal under Court of Chancery Rule 12(b)(6).[61] In resolving the motion, I must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the

---

[55] Carlyle Hunt HoldCo, L.L.C.'s Mot. to Intervene (Dkt. 17).

[56] Order Granting Mot. to Intervene (Dkt. 38).

[57] Verified Compl. in Intervention (Dkt. 39) ¶¶ 44-47.

[58] Defs.' Opening Br. in Supp. of Mot. to Dismiss Pls.' Verified Am. Compl. (Dkt. 52) ("Defs.' Opening Br.").

[59] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss Verified Am. Compl. (Dkt. 58) ("Pls.' Answering Br."); Defs.' Reply Br. in Further Supp. of Mot. to Dismiss Pls.' Verified Am. Compl. (Dkt. 61) ("Defs.' Reply Br.").

[60] *See* Dkt. 64.

[61] Ct. Ch. R. 12(b)(6).

11

non-moving party."[62]  I need not "accept every strained interpretation of [the plaintiffs'] allegations"[63] nor conclusory statements "unsupported by allegations of specific facts."[64]  Dismissal is appropriate only if the plaintiffs cannot "recover under any reasonably conceivable set of circumstances susceptible of proof."[65]

I begin my analysis by assessing the plaintiffs' standing.  I conclude that the Class A Plaintiffs lack standing entirely, and the Class B Plaintiffs lack standing to pursue a claim under 6 *Del. C.* § 18-110(b).

I then turn to the merits of the surviving claims, which fall into two categories corresponding to two entities.  First, I evaluate the Class B Plaintiffs' claims concerning Aspen Power (Counts I, III, and VI).  Two limited aspects of the contract claims survive, but the statutory claim under Section 18-110(a) is dismissed. Second, I address the remaining derivative claims brought by the Class A Plaintiffs on behalf of APP Management against Delaney and Vargas for breach of fiduciary duty (Count VII), breach of contract (Count VIII), and breach of the implied

---

[62] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[63] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[64] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom.*, *Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE).

[65] *Savor*, 812 A.2d at 896-97.

12

covenant of good faith and fair dealing (Count IX). Those claims are dismissed in their entirety.

## A. Standing

As a threshold matter, I must assess whether the plaintiffs have standing to pursue their claims. The defendants challenge the Class A Plaintiffs' standing to pursue Counts I, II, IV, and V, and the Class B Plaintiffs' standing to pursue Count I.[66] The Class B Plaintiffs have standing to bring Count I; the Class A Plaintiffs cannot press their claims for want of standing.

### 1. Standing Under Section 18-110

In Count I, the plaintiffs seek a declaratory judgment under 6 *Del. C.* § 18-110 regarding the proper composition of the Board and the validity of its decision to amend the Aspen Fourth LLC Agreement.[67] Only the Class B Plaintiffs have standing to pursue these claims.

#### a. Section 18-110(a)

Section 18-110(a) empowers the court to "hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a

---

[66] As defined above, the Class A Plaintiffs (J. Lehr and Bevvino-Berv) are members of APP Management, which holds Aspen Power's Class A Units. The Class B Plaintiffs (M. Lehr and the Trust) directly hold Aspen Power's Class B-1 Units.

[67] Am. Compl. ¶¶ 127-41.

13

limited liability company."[68]   Under the statute, "[a]ny member or manager" has standing to bring such a claim.[69]

The Class A Plaintiffs lack standing under this provision because they are neither members nor managers of Aspen Power.[70]   They are members of APP Management, which is a member of Aspen Power.[71]   The Class B Plaintiffs, however, have standing under Section 18-110(a).   M. Lehr and Enkelkinder Solar Trust are Class B-1 Unit holders and therefore members of Aspen Power.[72]

b.      Section 18-110(b)

Section 18-110(b) permits the court, "[u]pon application of any member or manager" to "hear and determine the result of any vote of members or managers upon matters as to which the members or managers . . . have the right to vote."[73] The plaintiffs argue that this provision grants *any* member of a limited liability

---

[68] 6 *Del. C.* § 18-110(a).

[69] *Id.*

[70] *See supra* notes 6-8 and accompanying text; Aspen Fourth LLC Agreement, Schedule A.

[71] Aspen Fourth LLC Agreement, Schedule A.  To the extent the Class A Plaintiffs rely on the APP Management LLC Agreement's recital—which states an intent to "pass along" rights to its members—that reliance is unavailing.  *See supra* note 8 and accompanying text (quoting APP Management LLC Agreement, Recitals).   Standing under Section 18-110 strictly requires a plaintiff to be an actual member or manager of the specific LLC whose governance is at issue.  The Class A Plaintiffs cite no authority providing that beneficial ownership or pass-through rights created by a holding vehicle's operating agreement satisfy the strict statutory standing requirements of the LLC Act.

[72] Aspen Fourth LLC Agreement, Schedule A.

[73] 6 *Del. C.* § 18-110(b) (emphasis added).

14

company the right to challenge a vote, regardless of whether they had the right to participate.[74] Alternatively, they assert that their consent was required to amend the Aspen Fourth LLC Agreement, giving them a right to a member vote and thus standing under Section 18-110(b).[75] Neither theory creates standing to pursue the claim.

The plaintiffs' reading of the statute is contrary to its plain text. "The 'most important consideration for a court in interpreting a statute is [the language] the General Assembly used in writing [the statute].'"[76] When "a statute is clear and unambiguous, 'the plain meaning of the statutory language controls.'"[77] "[A] statute is ambiguous only if it is reasonably susceptible to different interpretations, or 'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.'"[78]

Section 18-110(b) unambiguously permits "any member" to apply to determine the validity of "any vote of . . . managers," but only "upon matters as to

---

[74] Pls.' Answering Br. 27-28.

[75] *Id.* at 30-31.

[76] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 113 (Del. 2020).

[77] *Shawe v. Elting*, 157 A.3d 152, 164 (Del. 2017) (quoting *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 932-33 (Del. 2007)).

[78] *Ins. Comm'r of Del. v. Sun Life Assurance Co. of Can. (U.S.)*, 21 A.3d 15, 20 (Del. 2011) (quoting *Dir. of Rev. v. CNA Hldgs., Inc.*, 818 A.2d 953, 957 (Del. 2003)).

which the members or managers . . . have the right to vote."[79] The statute uses the definite article "the" to modify "members or managers," signaling a reference to the specific individuals who applied to the court.[80] This text means that the moving party may only challenge matters on which they possessed the right to vote pursuant to the limited liability company agreement. To hold otherwise would render the statutory reference to voting rights mere surplusage.[81]

Moreover, the statute limits challenges to matters on which the applicant has the right to vote "pursuant to the limited liability company agreement."[82] This phrase aligns with the Delaware Limited Liability Company Act's (the "LLC Act") stated policy of "giv[ing] the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[83] The Aspen Fourth LLC Agreement vests the Board with "exclusive authority" to manage Aspen

---

[79] 6 *Del. C.* § 18-110(b).

[80] *See* 6 *Del. C.* § 18-110(b) (granting the court authority to hear an "application of any member or manager" challenging "the result of any vote of members or managers upon matters as to which *the* members or managers of the limited liability company, or any class or group of members or managers, have the right to vote" (emphasis added)).

[81] *See Matter of Rehab. of Scot. RE (U.S.), Inc.*, 273 A.3d 277, 300 (Del. Ch. 2022) ("Delaware courts 'also ascribe a purpose to the General Assembly's use of statutory language, construing it against surplusage, if reasonably possible.'" (quoting *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011))); *see also* Defs.' Suppl. Br. Regarding 6 *Del. C.* § 18-110(b) (Dkt. 34) 6-7.

[82] 6 *Del. C.* § 18-110(b).

[83] *Id.*

Power's business and affairs.[84]  Section 5.8 specifically grants the Board the power to "change the number of Managers or composition of the Board, or the number of votes a given Manager is entitled to cast."[85]

Analogous law in the corporate context supports this reading.  Under 8 *Del. C.* § 225(b), a stockholder lacks standing to assert a claim contesting a vote they were not entitled to participate in.[86]  The Court of Chancery has held that a stockholder lacked standing under Section 225(b) to dispute a merger vote because the stockholder owned no shares on the record date and was not entitled to vote.[87] The same logic applies here.  The plaintiffs, as members, had no right to participate in the Board's written consent.  Permitting them to utilize Section 18-110(b) to challenge a board vote they were contractually excluded from would upend Aspen Power's negotiated governance structure.

Even if the plaintiffs had standing, their claim falls outside the substantive scope of the statute.  Section 18-110(b) allows the court to determine the "result" of

---

[84] Aspen Fourth LLC Agreement § 5.1(a); *see also id.* § 5.1(b) (providing that "Members, in their capacities as such, shall not manage the business and affairs of the Company, except to the extent that the affirmative vote or written consent of any of the Members is expressly required by th[e] Agreement or non-waivable provisions of applicable law").

[85] *Id.* § 5.8(a).

[86] 8 *Del. C.* § 225(b).

[87] *In re Banyan Mortg. Inv. Fund S'holders Litig.*, 1997 WL 428584, at *4 n.19 (Del. Ch. July 23, 1997).

a vote.[88]  But there was no member vote whose result is in dispute.  The plaintiffs'

true grievance is that the Board's action was insufficient without a parallel member

consent.

When a company takes an action without obtaining a contractually-required

approval, the aggrieved party may have a breach of contract claim.[89]  Such claims

may also invoke Section 18-111, which provides for actions to "interpret, apply or

enforce the provisions of a limited liability company agreement."[90]  They do not,

however, necessarily support a summary governance dispute under Section 18-

110(b).

The motion to dismiss the Section 18-110(b) claim is therefore granted, and

Count I is dismissed in part.

### 2.  Derivative Standing

Counts II and V are derivative claims brought by the Class A Plaintiffs on

behalf of APP Management against Aspen Power.[91]  The defendants argue that the

---

[88] 6 *Del. C.* § 18-110(b).

[89] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (explaining that the "breach of an obligation imposed by [a governing] contract" is one of three elements necessary to give rise to a claim for breach of contract).

[90] 6 *Del. C.* § 18-111.

[91] Am. Compl. ¶¶ 142, 170.

Class A Plaintiffs "contracted away their right to bring derivative claims" on behalf of APP Management, so these claims fail as a gating matter.[92] I agree.

"[B]ecause the policy of the [LLC] Act is to give the maximum effect to the principle of freedom of contract and to the enforceability of LLC agreements, the parties may contract to avoid the applicability of Section [18-1001]," which grants members the right to bring derivative actions.[93] Section 5.5 of the APP Management LLC Agreement does just that. It reads: "[w]ithout the unanimous written consent of the [APP Management] Class A Members, the Company shall not, and no Member o[r] Officer shall, cause the Company to . . . grant any consent or the waiving or exercising of any rights under the [Aspen Fourth LLC Agreement]."[94]

---

[92] Defs.' Opening Br. 53. The defendants argue that the Class A Plaintiffs did not satisfy their obligation to file an affidavit within ten days under Rule 23.1. Ct. Ch. R. 23.1(b) (requiring that the plaintiff file an affidavit "stat[ing] that the person has not received, been promised, or been offered . . . any form of compensation . . . for serving as a derivative plaintiff[]"); Defs.' Opening Br. 49. The Class A Plaintiffs filed their Amended Complaint on May 15, 2025. Dkt. 46. They filed the requisite verifications and affidavits on July 15, 2025, after the defendants called attention to the issue. Letter Attaching Verifications to Am. Compl. (Dkt. 53). The defendants argue that the Class A Plaintiffs' failure to timely file the affidavits was not an oversight but reflective of self-interest. Defs.' Opening Br. 49-51. I cannot know the plaintiffs' intent. But even if the defendants were right, I resolve the motion on other grounds and need not reach this issue.

[93] *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999); *see* 6 *Del. C.* § 18-1001.

[94] APP Management LLC Agreement § 5.5(i).

Thus, the Class A members of APP Management cannot exercise any rights on APP Management's behalf without the unanimous consent of all members.[95]

Pursuing derivative litigation falls within that provision. A derivative suit is, by definition, an exercise of the entity's rights.[96] Here, two APP Management members—J. Lehr and Bevvino-Berv—seek to exercise APP Management's rights as an Aspen Power member through derivative litigation.

To the extent the plaintiffs rely on the remedies provision in Section 13.3 of the APP Management LLC Agreement to bypass this restriction, that argument fails. Under Delaware law, specific contractual provisions control over general ones.[97] Section 13.3 generally entitles a member to enforce their rights under the APP

---

[95] Under Delaware law, limited liability company agreements are interpreted using standard principles of contract interpretation. *See Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018) ("When analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts."). The court construes the contract as a whole, giving each word its plain meaning and effect, so as not to render any provision illusory or meaningless. *See Nw. Nat'l Ins. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[96] *Cf. Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) (explaining that a derivative suit "enables a stockholder to bring suit on behalf of the corporation for harm done to the corporation").

[97] *See DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

Management LLC Agreement.[98] But Section 5.5(i) acts as a specific limitation, expressly prohibiting any member from causing APP Management to exercise its rights under the Aspen Fourth LLC Agreement without unanimity.[99]

Unanimous consent was not obtained. Instead, two APP Management members—J. Lehr and Bevvino-Berv—seek to press derivative claims without the involvement of their fellow members. Thus, the Class A Plaintiffs lack standing to bring Counts II and V derivatively on behalf of APP Management. Counts II and V are dismissed on that basis.[100]

### 3. Direct Standing

In Count IV, the Class A Plaintiffs assert a direct breach of contract claim against Aspen Power. Because they are neither parties to nor third-party beneficiaries of the Aspen Fourth LLC Agreement, they lack standing to pursue this claim.

---

[98] APP Management Agreement § 13.3 (providing that "[e]ach Member shall have all rights and remedies set forth in this Agreement" and that "[a]ny Person having any rights under any provision of this Agreement . . . shall be entitled to enforce such rights specifically").

[99] *Id.* § 5.5(i); *see supra* note 94 (quoting the provision).

[100] Even if the Class A Plaintiffs had standing to bring these claims derivatively on behalf of APP Management, Counts II and V would nevertheless be dismissed. As discussed *infra* in Section II.B.2, the plaintiffs fail to state a claim for breach of the Aspen Fourth LLC Agreement. Because the underlying breach of contract claims fail on the merits, the derivative claims are likewise meritless.

"As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions. Mere incidental beneficiaries have no legally enforceable rights under a contract."[101] "To qualify as a third party beneficiary of a contract, (i) the contracting parties must have intended that the third party beneficiary benefit from the contract, (ii) the benefit must have been intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party must be a material part of the parties' purpose in entering into the contract."[102]

The Class A Plaintiffs are not parties to the Aspen Fourth LLC Agreement.[103] They are members of APP Management, which is a member of Aspen Power.[104]

---

[101] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007); *see also Kronenberg v. Katz*, 872 A.2d 568, 605 n.74 (Del. Ch. 2004).

[102] *Madison Realty P'rs 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

[103] Am. Compl. ¶¶ 31, 32. The plaintiffs claim that they are "beneficial owners" of Aspen Power, by virtue of their membership in APP Management. *Id.* Such beneficial ownership is generally insufficient to assert standing to sue or other rights inherent to membership. *See, e.g.*, *R.R Cap., LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *2 (Del. Ch. Aug. 19, 2008) ("There is no authority for the proposition that a member of an LLC which is itself a member of another LLC can seek dissolution or the winding up of the latter LLC."); *Prokupek v. Consumer Cap. P'rs LLC*, 2014 WL 7452205, at *7 (Del. Ch. Dec. 30, 2014) (finding that, though the plaintiff was "recently a member" of an LLC via beneficial ownership, such "circumstances [did] not justify stretching the LLC Act's plain language in order to find standing").

[104] Aspen Fourth LLC Agreement, Schedule A.

22

The Class A Plaintiffs are also not intended third-party beneficiaries of the Aspen Fourth LLC Agreement. Consistent with Delaware's pro-contractarian policy in the LLC context, the parties' intent to create a third-party beneficiary depends on the text of the operative agreement.[105] Here, the Aspen Fourth LLC Agreement makes no mention of third-party beneficiaries, suggesting that no such beneficiaries exist.[106]

The Complaint also lacks well pleaded facts to satisfy the requirements of a third-party beneficiary status.[107] The plaintiffs do not allege that the Aspen Fourth LLC Agreement was intended to benefit them, let alone to confer a "gift" or satisfy a preexisting obligation.[108] Rather, the Complaint acknowledges that the Aspen Fourth LLC Agreement was designed to govern its core operations and define its members' evolving rights and responsibilities.[109]

The plaintiffs' rebuttal is unavailing. They argue that the Class A Plaintiffs are third-party beneficiaries because the "sole purpose of APP Management is to

---

[105] *See Kronenberg*, 872 A.2d at 605.

[106] *See id.* (explaining that because an LLC agreement "d[id] not expressly provide for [the purported beneficiary] to benefit from its terms . . . the plain language of the LLC [a]greement preclude[d] [any] attempt to claim third-party beneficiary status").

[107] *See supra* note 102 and accompanying text (summarizing the elements).

[108] *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *7 (Del. Ch. May 16, 2007) (dismissing a third-party beneficiary claim where the complaint failed to allege facts supporting the creation of third-party beneficiary status).

[109] Am. Compl. ¶¶ 9, 46.

hold the Class A Units of Aspen on behalf of the founding members and to grant [them] the same rights they would have if they were Class A Members of the Company."[110] This argument misconstrues the focus of the relevant inquiry. My role is not to examine the purposes for forming APP Management; it is to consider whether the parties to the Aspen Fourth LLC Agreement intended to confer a benefit on the Class A Plaintiffs. Given the text of the Aspen Fourth LLC Agreement and the allegations in the Complaint, there is no basis to infer that the Class A Plaintiffs were anything more than incidental beneficiaries.[111]

Because the Class A Plaintiffs are neither parties to nor third-party beneficiaries of the Aspen Fourth LLC Agreement, the motion to dismiss is granted as to Count IV.

*        *        *

The motion to dismiss is granted as to Counts II, IV, and V for lack of standing. The motion to dismiss is also granted, in part, as to Count I on the same basis. As explained below, what remains of Count I fails on the merits. I proceed to analyze the merits of the claims on which the plaintiffs have standing.

---

[110] Pl.'s Answering Br. 32 (emphasis omitted).

[111] *Madison Realty*, 2001 WL 406268, at *5 (providing an illustration from the Restatement (Second) of Contracts to parse the distinction between incidental and intended third-party beneficiaries); *Restatement (Second) of Contracts* § 302 cmt. b, illus. 3 (A.L.I. 1979).

**B. The Merits**

The remaining claims in the Amended Complaint fall into two categories, each focused on a different entity. I address each set separately.

First, I address the Class B Plaintiffs' claims concerning Aspen Power (Counts I, III, and VI). Count I seeks a declaration under 6 *Del. C.* § 18-110(a) regarding the proper composition of the Board. Counts III and VI advance direct claims for declaratory judgment and breach of contract, alleging that the adoption of the Aspen Fifth LLC Agreement violated the plaintiffs' consent rights in Section 14.2 of the Aspen Fourth LLC Agreement. Two limited aspects of the contract claims survive, but the statutory claim is dismissed.

Second, having dismissed Counts II and V for lack of derivative standing, I address the remaining derivative claims brought by the Class A Plaintiffs on behalf of APP Management against Delaney and Vargas. These claims allege breaches of fiduciary duty (Count VII), and breaches of contract (Count VIII) and of the implied covenant of good faith and fair dealing (Count IX) arising out of the APP Management LLC Agreement. These claims are dismissed in full.

### 1. Section 18-110(a)

In Count I, the Class B Plaintiffs seek a declaratory judgment under 6 *Del. C.* § 18-110 regarding the proper composition of the Board and the voting power of

each manager.[112]  As explained above, only the Class B Plaintiffs have standing to pursue the Section 18-110(a) claim; none of the plaintiffs have standing under Section 18-110(b).[113]  The remaining claim under Section 18-110(a) fails on the merits.

"A proceeding under Section 18-110(a) 'is summary in character, and its scope is limited to determining those issues that pertain to the validity of actions to elect or remove' a manager."[114]  The statute permits the court to "hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company."[115]  "In determining what claims are cognizable in a [Section 18-110(a)] action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the [company's] board or management team."[116]

Here, the Board composition is unchanged.  After the Aspen Fifth LLC Agreement purportedly took effect, the Board retained the same seven managers it

---

[112] Am. Compl. ¶¶ 127-41.

[113] *See supra* notes 68-72 and accompanying text.

[114] *Llamas v. Titus*, 2019 WL 2505374, at *15 (Del. Ch. June 18, 2019) (citing *Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011)).

[115] 6 *Del. C.* § 18-110(a).

[116] *Lynch v. Gonzalez Gonzalez*, 2020 WL 3422399, at *5 (Del. Ch. June 22, 2020) (citing *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999)).

had when the Aspen Fourth LLC Agreement was in place: Anand, Vargas, DeLong, Delaney, Sherk, Hanelt, and Welch.[117] The creation of three "open spots" under the Aspen Fifth LLC Agreement is of no import because no new managers have been appointed to fill them, nor have any existing managers been removed.[118]

Accordingly, the limited scope of Section 18-110(a) is not implicated, and the motion to dismiss what remains of Count I is granted for failure to state a claim.[119]

### 2.    Breach of the Aspen Fourth LLC Agreement

The Class B Plaintiffs advance direct claims for declaratory relief (Count III) and for breach of contract (Count VI).[120] Both claims allege that Aspen Power breached Section 14.2 of the Aspen Fourth LLC Agreement by adopting the Aspen Fifth LLC Agreement without the Class B Plaintiffs' prior written consent.[121] To state a claim for breach of contract, a plaintiff must plead: (1) the existence of a valid

---

[117] Am. Compl. ¶¶ 101-02.

[118] *See id.* ¶ 102.

[119] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9.09[b], at 9-202 (2018) ("It has been said to be improper to employ this statutory proceeding as a vehicle for the determination of individual disputes that do not directly affect the specific claims referenced in the statute.").

[120] Am. Compl. ¶¶ 152-61, 175-78.

[121] *Id.* ¶¶ 159-61, 177.

contract; (2) a breach of an obligation imposed by that contract; and (3) resulting damages.[122]

Settled principles of contract interpretation govern the motion to dismiss these claims.[123] Delaware follows the "objective theory of contracts," which provides that "a contract's construction should be that which would be understood by an objective, reasonable third party."[124] Language that is "clear and unambiguous" must "be given its ordinary and usual meaning."[125] The court must analyze the contract "as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage."[126]

Section 14.2 states:

> [T]he prior written consent of an affected Member (or class of Members) shall also be required if any such amendment, amendment and restatement, modification or other supplement, or waiver on behalf of the Company, would . . . (b) alter the interest of a Member in Company Distributions, other than as a

---

[122] *See VLIW Tech.*, 840 A.2d 606, 612 (Del. 2003); *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[123] *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 923-24 (Del. 2023) (explaining that "[w]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts" (citation omitted)); *see also* 6 *Del. C.* § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements.").

[124] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *Osborn*, 991 A.2d at 1159).

[125] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[126] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 397 (Del. 2010)).

28

result of the admission or withdrawal of a Member, or issuance or Transfer of any Equity Securities, (c) modify Section 3.1(c) or otherwise require the making of an additional Capital Contribution other than upon the terms set forth herein . . . (e) adversely and disproportionately affect the rights or obligations of any class vis-à-vis the rights or obligations of any other class; or (f) notwithstanding Section 5.9(a), adversely modify or waive the preemptive rights of such Member or class or group of Members[.][127]

The Class B Plaintiffs assert that six amendments required their prior written consent: (1) giving Carlyle three additional Board seats with four times the voting power; (2) creating the PPUs; (3) modifying the "MOIC Uplift" schedule;[128] (4) removing APP Management's consulting rights; (5) transferring APP Management's drag-along rights to Carlyle; and (6) modifying the plaintiffs' preemptive rights.[129] These theories have mixed success. The defendants' motion to dismiss is denied as to the modifications of the MOIC Uplift schedule and to the plaintiffs' preemptive rights. It is otherwise granted.

---

[127] Aspen Fourth LLC Agreement § 14.2.

[128] *See id.* at Ex. D (setting out the applicable MOIC Uplift multiplier schedule).

[129] Am. Compl. ¶ 177. The Complaint also identifies that the Aspen Fifth LLC Agreement had "material modifications to the definition and mechanics of an Approved Repayment Transaction[.]" *Id.* ¶ 23. But the plaintiffs did not brief this issue in their opposition to the motion to dismiss. "Issues not briefed are deemed waived." *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

### a. Board Seats and Voting Power

First, the Class B Plaintiffs claim that, under Section 14.2, their consent was required before the Aspen Fourth LLC Agreement was amended to add three Board seats and give Carlyle's designees four times the voting power.[130] This argument is without merit because a separate, specific provision of the Aspen Fourth LLC Agreement governs the issue.

Section 5.8 states, in relevant part:

> Notwithstanding anything to the contrary herein, the Company shall not, and shall cause each of its Subsidiaries to not, directly or indirectly, and the Officers shall not . . . cause the Company or any of its Subsidiaries, without the unanimous approval of the Board . . . to . . . change the number of Managers or composition of the Board, or the number of votes a given Manager is entitled to cast with [respect to] a given matter, or amend, alter, supplement, or repeal the procedures of the Company for the election of Managers.[131]

This provision delegates exclusive authority to the Board to "change the number of Managers," the "composition of the Board," or the "number of votes a given Manager is entitled to cast[.]"[132] The Class B Plaintiffs' claims involve these precise changes.[133]

---

[130] Pls.' Answering Br. 10-15.

[131] Aspen Fourth LLC Agreement § 5.8.

[132] *Id.*

[133] Am. Compl. ¶ 177.

30

As explained above, "where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."[134] Here, Section 5.8 addresses amendments to the composition or structure of the Board. It also includes a "notwithstanding anything to the contrary herein" clause, which this court has previously read to prevail over more general language elsewhere in the contract.[135] Section 14.2(e), by contrast, generally provides for consent when members' rights are "adversely and disproportionately" affected vis-à-vis other members.[136] Because Section 5.8 is the "more specific clause" regarding amendments affecting Board composition, it controls over the more general provision.[137]

---

[134] *DCV Hldgs.*, 889 A.2d at 961; *see supra* note 97 and accompanying text.

[135] *Katell v. Morgan Stanley Gp., Inc.*, 1993 WL 205033, at *3 (Del. Ch. Jun. 8, 1993) (explaining that a "notwithstanding" clause suggests that a term is "paramount to all other provisions" in a given contract); *Medicis Pharm. Corp. v. Anacor Pharms., Inc.*, 2013 WL 4509652, at *8 n.46 (Del. Ch. Aug. 12, 2013) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override [potentially] conflicting provisions of any other section." (citing *Cisneros v. Alpine Ridge Gp.*, 508 U.S. 10, 18 (1993))).

[136] Aspen Fourth LLC Agreement § 14.2(e).

[137] *Katell*, 1993 WL 205033, at *4 ("When there is an [alleged] inconsistency between general and specific provisions, the specific provisions ordinarily qualify the meaning of the general ones, due to the reasonable inference that specific provisions express more exactly what the parties intended.").

31

The Class B plaintiffs do not allege that the Board violated Section 5.8's requirements. All seven Board members voted in favor of the amendment.[138] The motion to dismiss is granted as to this aspect of Counts III and VI.

### b. Phantom Preferred Units and MOIC Uplift

Next, the Class B Plaintiffs argue that the Aspen Fifth LLC Agreement's creation of PPUs and alterations to the MOIC Uplift schedule modified their interest in Aspen Power distributions, triggering a consent right under Section 14.2(b).[139] This claim is not reasonably conceivable as to the PPUs. But it survives regarding the MOIC Uplift schedule.

Prior member consent of an affected member is required when an amendment would "alter the interest of a Member in Company Distributions."[140] The Aspen Fourth LLC Agreement defines "Distributions" as "each distribution made by the Company to a Member, whether in cash or other property of the Company."[141] The definition excludes, among other things, "any fees, other remuneration or expense reimbursement paid to any Member in such Member's capacity as an employee,

---

[138] Am. Compl. ¶ 19.

[139] *Id.* ¶¶ 23, 75-80; *see* Aspen Fourth LLC Agreement § 14.2(b) (requiring prior written consent where an amendment would "alter the interest of a Member in Company Distributions"); *id.* at Definitions (defining "Company Distributions"); *id.* at Ex. D.

[140] Aspen Fourth LLC Agreement § 14.2(b); *id.* at Definitions (defining "Member" and "Distributions").

[141] *Id.* at Definitions.

director, manager, officer, consultant or other service provider of the Company."[142] Further, the LLC Act defines "[l]imited liability company interest" as "a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets."[143]

### i. PPUs

PPUs "represent the right to receive a cash bonus in an amount equal to the Fair Market Value of a Preferred Unit" of Aspen Power equity, "payable upon a [sale of the company] or a [l]iquidation [e]vent" occurring within ten years of the PPU's issuance.[144] They are part of a management incentive program.[145] The "Member Economics Term Sheet" attached to the Aspen Fourth LLC Agreement states that "[f]or the avoidance of doubt, the [PPUs] are not equity interests and an award of [PPUs] shall not by itself in any way entitle the recipient thereof to any rights as an equityholder of the Company or any of its Affiliates."[146]

PPUs do not create interest in Aspen Power or a right to distributions. They are deferred cash compensation for employees to be drawn from the proceeds from

---

[142] *Id.*

[143] 6 *Del. C.* § 18-101(10).

[144] Aspen Fifth LLC Agreement Ex. F.

[145] Am. Compl. ¶ 110.

[146] Aspen Fifth LLC Agreement Ex. F.

33

a sale of the company or termination event.[147]  The Aspen Fourth LLC Agreement's definition of Distributions excludes "fees, [or] other remuneration . . . paid . . . in [a] Member's capacity as an employee . . . of the Company."[148]  Because PPUs are explicitly defined as a "cash bonus" established as an incentive arrangement for "certain key employees," they fall within this exclusion.[149]

ii.       *MOIC Uplift Schedule*

Section 4.1 of the Aspen Fourth LLC Agreement sets out a distribution waterfall.  It states that holders of Preferred Units (i.e., Carlyle) are allocated 100% of certain Distributions until they receive an amount equal to the MOIC Uplift.[150] The MOIC Uplift is determined by multiplying unreturned capital contributions against a multiplier.[151]  Under the Aspen Fourth LLC Agreement, that multiplier was set initially at 0.15 and subject to annual increases of 0.10 over a seven-year period.[152]  The Aspen Fifth LLC Agreement maintained the base multiplier of 0.15,

---

[147] *Id.*

[148] Aspen Fourth LLC Agreement, Definitions.

[149] Aspen Fifth LLC Agreement Ex. F.

[150] Aspen Fourth LLC Agreement § 4.1.

[151] Am. Compl. ¶ 78 (citing Aspen Fourth LLC Agreement Ex. D).

[152] Aspen Fourth LLC Agreement Ex. D.

but altered the MOIC Uplift schedule to increase the multiplier by 0.025 at quarterly intervals.[153]

The plaintiffs assert that this change steers more distributable proceeds to Carlyle faster, before funds can "trickle down to the lower levels of the distribution waterfall."[154] The defendants respond that the Aspen Fifth LLC Agreement merely apportioned the existing schedule from annually to quarterly, while keeping the aggregate annual and total MOIC Uplift multiplier the same.[155] But I must credit the plaintiffs' allegation that the change structurally subordinates or delays the distributions reaching the junior Class B units.[156] If the quarterly compounding accelerates or increases Carlyle's entitlement under the distribution waterfall, it is reasonably conceivable that the amendment altered the Class B Plaintiffs' "interest . . . in Company Distributions" within the meaning of Section 14.2(b).[157]

The defendants additionally argue that even if the plaintiffs' interests were altered, Section 14.2(b) of the Aspen Fourth LLC Agreement contains a safe harbor exempting alterations that occur "as a result of the . . . issuance or Transfer of any

---

[153] *Compare id.*, *with* Aspen Fifth LLC Agreement Ex. D.

[154] Am. Compl. ¶ 79.

[155] Defs.' Opening Br. 20-21.

[156] *See* Am. Compl. ¶ 79.

[157] Aspen Fourth LLC Agreement § 14.2(b).

Equity Securities."[158]  They say the MOIC Uplift changes were a direct result of Carlyle's new equity investment.[159]  The plaintiffs, however, allege that Aspen Power had alternative capital available and that Carlyle opportunistically demanded these changes as a condition of its investment.[160]  Resolving how the MOIC Uplift functions and whether its modification in the Aspen Fifth LLC Agreement was a mechanical result of issuing new equity is a factual dispute unfit for resolution on a motion to dismiss.

### c.        Drag-Along Rights and Consulting Rights

The Aspen Fifth LLC Agreement also transferred drag-along rights from APP Management to Carlyle and removed APP Management's consulting rights.[161]  The Class B Plaintiffs contend that these changes violate Section 14.2(e) of the Aspen Fourth LLC Agreement, which requires prior written consent when an amendment "adversely and disproportionately" affects the rights of a given class.[162]  These claims are without merit.

---

[158] *Id.*; *see* Defs.' Opening Br. 21.

[159] Defs.' Opening Br. 21.

[160] Am. Compl. ¶¶ 11-12.

[161] *Id.* ¶ 172.

[162] *Id.* ¶¶ 69, 74; *see* Aspen Fourth LLC Agreement § 14.2(e).

i.    *Drag-Along Rights*

Section 8.5 of the Aspen Fourth LLC Agreement provides drag-along rights, which allow a controlling member to force all other members to participate in a sale of the company to an unaffiliated third party.[163]  The agreement grants this right to the "Member having Control of the Company."[164]  The Aspen Fifth LLC Agreement did not amend the substance of Section 8.5.  Rather, the holder of the "Member Having Control of the Company" title shifted from APP Management to Carlyle by virtue of the changes to the Board composition and voting power.[165]

Section 14.2(e) protects the rights and obligation of "any class vis-à-vis the rights or obligations of any other class."[166]  The drag-along right is not a "class right."  It is an individual right belonging to whichever member holds "Control" of Aspen Power.  Because the drag-along right never belonged to the Class A Unit holders as a class, transferring it from APP Management to Carlyle does not trigger Section 14.2(e)'s class consent protections.[167]

---

[163] Aspen Fifth LLC Agreement § 8.5.

[164] *Id.*

[165] *Id.*  There are no substantive changes to Section 8.5 beyond redefining who constitutes the control member.  *Compare* Aspen Fourth LLC Agreement § 8.5, *with* Aspen Fifth LLC Agreement § 8.5.

[166] Aspen Fourth LLC Agreement § 14.2(e).

[167] Aspen Fifth LLC Agreement § 8.5; *see* Aspen Fourth LLC Agreement, Definitions (defining "Control"); *see also supra* notes 130-138 (explaining why expanding the board by three and altering voting power is lawful under the Aspen Fourth LLC Agreement).

## ii.  *Consulting Rights*

In Section 6.10 of the Aspen Fourth LLC Agreement, APP Management was granted specific consulting rights:

> Each of APP Management HoldCo and the Preferred Members constituting an Investor Majority shall use commercially reasonable efforts to meet within sixty (60) days of the first anniversary of the Effective Date to review the capital call process . . . to consider in good faith any reasonable amendments that may be required to this Agreement.[168]

The "Effective Date" of the Aspen Fourth LLC Agreement is September 29, 2022.[169]  Sixty days after the first anniversary of the Aspen Fourth LLC Agreement's effective date was November 28, 2023.  APP Management's right to consult with Carlyle thus passed well before the Aspen Fifth LLC Agreement took effect on December 24, 2024.[170]  Because the consultation right already expired, its removal from the Aspen Fifth LLC Agreement could not conceivably have had an adverse effect on APP Management's rights.  The removal of Section 6.10 simply abrogated a provision that was no longer operative.

---

[168] Aspen Fourth LLC Agreement § 6.10.

[169] *Id.* at Preamble.

[170] *Id.*

d.     Preemptive Rights

Finally, the Class B Plaintiffs argue that two changes in the Aspen Fifth LLC Agreement—the expansion of the "Excluded Securities" definition and inclusion of a preemptive rights waiver—breached Section 14.2(f) of the Aspen Fourth LLC Agreement.[171] Section 14.2(f) requires prior written approval for amendments that would "adversely modify or waive the preemptive rights" of a given member, class, or group of members.[172]

Section 3.1(f) of the Aspen Fourth LLC Agreement gave members the right to purchase their proportional share of new equity issuances, subject to a defined list of "Excluded Securities."[173] The Aspen Fifth LLC Agreement expanded this list to include "Equity Securities issued or sold pursuant to any employment agreement . . . incentive [] plan," and "Effective Date-Related Issuances."[174]

---

[171] Pls.' Answering Br. 21.

[172] Aspen Fourth LLC Agreement § 14.2(f).

[173] *Id.* § 3.1(f)(1).

[174] Aspen Fifth LLC Agreement, Definitions (adding to the definition of Excluded Securities "Equity Securities issued or sold pursuant to any employment agreement or arrangement, employee equity ownership programs, unit option plan, restricted unit agreement, incentive compensation plan or program or similar incentive compensation program[]" and "Effective Date-Related Issuances"); *id.* (defining "Effective Date Related Securities" as "issuances of Equity Securities in the Company occurring on the Effective Date under this Agreement or contemplated to occur after the Effective Date" pursuant to a member economics plan).

The defendants argue that these amendments did not "adversely modify or waive" members' preemptive rights because the new exclusions apply to categories of securities that did not exist under the Aspen Fourth LLC Agreement.[175] Under the Aspen Fourth LLC Agreement, however, the preemptive right was broad. It functioned as a catch-all, granting members the right to participate in *any* equity issuance not expressly excluded.[176] Because the baseline right captured all unspecified future securities, adding new categories to the exclusion list—even those that did not previously exist—shrunk the universe of securities to which it applies. At the pleading stage, it is reasonably conceivable that this reduction adversely modified the plaintiffs' preemptive rights, triggering the pre-approval requirement in Section 14.2(f).

The Class B Plaintiffs' position is bolstered by the addition of Section 8.15 of the Aspen Fifth LLC Agreement. Under that provision, members "waive[d] any and all rights to notice and participation in the Effective Date-Related Issuances."[177] This waiver dovetails with the expanded definition of the "Excluded Securities" list and achieves the same practical result of removing the plaintiffs' preemptive rights

---

[175] Defs.' Opening Br. 31.

[176] Aspen Fourth LLC Agreement § 3.1(f)(1).

[177] Aspen Fifth LLC Agreement § 8.15.

for such issuances.[178]  It can be reasonably inferred that the Section 8.15 waiver adversely modified the Class B Plaintiffs' preemptive rights.

*          *          *

The motion to dismiss Counts III and VI is denied as to the Class B Plaintiffs' claims regarding the modification of the MOIC Uplift Schedule and their preemptive rights. The motion to dismiss the claims in Counts III and VI is otherwise granted.

### 3.    Breach of Fiduciary Duty to APP Management

In Count VII, the Class A Plaintiffs advance a derivative claim on behalf of APP Management for breach of fiduciary duty against Delaney and Vargas.[179]  "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[180]  The Class A Plaintiffs allege that Delaney and Vargas breached their fiduciary duties to APP Management by "eviscerating APP Management's right to control the [Aspen Power Board] in

---

[178] *Id.* at Definitions (Effective Date-Related Issuances).

[179] Am. Compl. ¶¶ 179-86.  Count VII, like Counts II and V, is a derivative claim brought on behalf of APP Management.  Counts II and V were dismissed for lack of standing because Section 5.5(i) of the APP Management LLC Agreement bars APP Management members from bringing derivative claims to enforce rights under the Aspen Fourth LLC Agreement without unanimous consent. *See supra* Section II.A.2.  Count VII, however, asserts breaches of fiduciary duty under Delaware law and the APP Management LLC Agreement itself.  Because Count VII does not seek to enforce rights under the Aspen Fourth LLC Agreement, Section 5.5(i) does not serve as a procedural bar.  I therefore evaluate Count VII on its merits under the APP Management LLC Agreement.

[180] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

41

exchange for personal monetary gain" through "lucrative compensation packages."[181]  The parties offer competing provisions of the APP Management LLC Agreement that they believe resolve the claim.

The Class A Plaintiffs invoke Section 5.4(d) of the APP Management LLC Agreement, the duties of "Officers."[182]  That provision states that:

> Officers [of APP Management], ***in the performance of their duties as such***, shall owe to [APP Management] and its Members duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the Laws of the State of Delaware.[183]

When this lawsuit was filed, both Delaney and Vargas held Officer positions at APP Management.[184]

The defendants, for their part, argue that Section 6.4 of the APP Management LLC Agreement is dispositive.[185]  The LLC Act permits parties to restrict or eliminate fiduciary duties in an LLC agreement.[186]  Section 6.4 does just that:

---

[181] Am. Compl. ¶¶ 183-84.

[182] APP Management LLC Agreement § 5.4(d).  Section 5.4(a) states that the list of Officers was in Appendix II to the APP Management LLC Agreement.  APP Management LLC Agreement § 5.4(a).  The list was in Appendix I.  *Id.* at Appendix I.

[183] *Id.* § 5.4(d) (emphasis added).

[184] *Id.* at Appendix I.

[185] Defs.' Opening Br. 57-58.

[186] 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties

> The Members expressly acknowledge that, subject to applicable Law, (i) each Member and its Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships with entities engaged in the Business other than through the Company or its Subsidiaries, and/or may otherwise engage in other activities (such activities, collectively, the "Other Business") . . . and, to the fullest extent permitted by Law, ***the Members shall not have or be under any fiduciary duty, duty of loyalty, duty of care or duty to act in good faith or in the best interests of the Company*** or any of its Subsidiaries ***or Members*** and shall not be liable to the Company or any of its Subsidiaries or Members for any breach or alleged breach thereof . . . .[187]

The defendants aver that this provision waives members' fiduciary duties regarding corporate opportunities outside of APP Management.[188]

Sections 5.4(d) and 6.4 contemplate two spheres of conduct—one in which members owe fiduciary duties, and the other in which fiduciary duties are disclaimed. Section 5.4(d) makes plain that members of APP Management only owe fiduciary duties in the "performance of their duties as [Officers]," meaning that the provision applies when one is acting in his official capacity.[189] But when members

---

may be expanded or restricted or eliminated by provisions in the limited liability company agreement[.]"); *see also* 6 *Del. C.* § 18-1101(b); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1063 (Del. Ch. 2006) ("In the alternative entity context, where it is more likely that sophisticated parties have carefully negotiated the governing agreement, the General Assembly has authorized even broader exculpation, to the extent of eliminating fiduciary duties altogether.").

[187] APP Management LLC Agreement § 6.4 (emphasis added).

[188] Defs.' Opening Br. 58.

[189] APP Management LLC Agreement § 5.4(d).

are not functioning as APP Management Officers, they owe no fiduciary duties.[190]

Reconciling the text in this manner ensures that no provision of the APP Management LLC Agreement is rendered "mere surplusage."[191]

The Complaint describes no action taken by Delaney or Vargas in an Officer capacity. The Class A Plaintiffs complain only of actions taken by Delaney and Vargas while acting as managers of Aspen Power in amending the Aspen Fourth LLC Agreement.[192] Although APP Management designated Delaney and Vargas to the Aspen Power Board, Delaware law respects the distinct corporate capacities in which individuals serve.[193] When evaluating and voting on the amendments to the Aspen Fourth LLC Agreement, Delaney and Vargas were acting as fiduciaries of Aspen Power, not performing duties as Officers of APP Management.[194]

As a result, Section 5.4(d) does not apply to the present scenario, and Section 6.4 governs. Because the plaintiffs challenge conduct that Delaney and Vargas took

---

[190] *Id.* § 6.4.

[191] *Osborn*, 991 A.2d at 1159 (quoting *Kuhn Constr.*, 990 A.2d at 397).

[192] Am. Compl. ¶¶ 183-85 (describing Delaney and Vargas voting as Managers of Aspen Power to amend the Aspen Fourth LLC Agreement).

[193] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 46-47 (Del. Ch. 2013) (explaining that directors owe duties to the entity on whose board they sit, even if appointed by a specific stockholder).

[194] *See* Aspen Fourth LLC Agreement § 5.2(a)(i).

in an entirely different capacity—as Aspen Power managers—the claim for breach of fiduciary duty fails.  The motion to dismiss Count VII is granted.

### 4.    Breach of the APP Management LLC Agreement

Counts VIII and IX are claims for breach of the APP Management LLC Agreement, brought directly by the Class A Plaintiffs against Vargas and Delaney.[195] In Count VIII, the Class A Plaintiffs allege that by consenting to amend the Aspen Fourth LLC Agreement, Delaney and Vargas breached a unanimous consent provision in the APP Management LLC Agreement.[196]  In Count IX, they raise an alternative theory that Delaney and Vargas breached the implied covenant of good faith and fair dealing.[197]  Neither claim succeeds.

### a.    Breach of Section 5.5

Section 5.5(i) of the APP Management LLC Agreement states:

> Without the unanimous written consent of the Class A Members, the Company shall not, and no Member o[r] Officer shall cause the Company to . . . (i) grant any consent or the waiving or exercising of any rights under the APP HoldCo Operating Agreement.[198]

---

[195] Am. Compl. ¶¶ 187-209.

[196] *Id.* ¶¶ 187-96.

[197] *Id.* ¶¶ 197-209.

[198] APP Management LLC Agreement § 5.5(i).

45

The plaintiffs allege that Delaney and Vargas breached this provision by voting to approve the Aspen Fifth LLC Agreement without first obtaining unanimous consent from APP Management's Class A members.[199] But they have not pleaded facts to support this claim.[200]

Section 5.5(i) of the APP Management LLC Agreement requires unanimous consent of the Class A members only when APP Management is acting to affirmatively waive or exercise its rights under the Aspen Fourth LLC Agreement.[201] The Class A Plaintiffs do not, however, allege that APP Management took any action in adopting the Aspen Fifth LLC Agreement. The Complaint addresses only actions that Vargas and Delaney took in their capacities as Aspen Power managers.[202] Because APP Management is not alleged to have engaged in any conduct relating to the amendment of the Aspen Fourth LLC Agreement, no reasonably conceivable breach of Section 5.5(i) is pleaded.

The reference to "Officers" and "Members" in Section 5.5(i) does not resuscitate the claim. That text limits officers and members' ability to bind APP Management, stating that "no Member [or] Officer shall cause [APP Management]"

---

[199] Am. Compl. ¶¶ 189-90.

[200] *See supra* note 122 and accompanying text (listing the elements for a breach of contract claim).

[201] APP Management LLC Agreement § 5.5(i).

[202] Am. Compl. ¶¶ 84-85.

to take any actions that might "waiv[e] or exercis[e]" its rights under the APP Management LLC Agreement.[203]  Again, there is no allegation that APP Management acted.[204]  The fact that Delaney and Vargas were the "designees of APP Management" on the Aspen Power Board is not equivalent to APP Management acting.[205]  When acting as managers, Delaney and Vargas owed duties to Aspen Power and its equityholders, regardless of who appointed them to the Board.  Their votes to amend the Aspen Fourth LLC Agreement were made in their capacities as fiduciaries of Aspen Power, not as agents acting for APP Management.

Put differently, Section 5.5(i) restricts APP Management's ability to act.  It does not require Aspen Power managers to obtain consent from APP Management's members before acting in their separate fiduciary capacities.  Count VIII is dismissed.

### b.     Breach of the Implied Covenant

The Class A Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing in Count IX is pleaded in the alternative to Count VIII.[206]  They allege that Delaney and Vargas breached the implied covenant by using their

---

[203] APP Management LLC Agreement § 5.5(i).

[204] *See* Am. Compl. ¶ 19.

[205] Am. Compl. ¶ 19; Aspen Fourth LLC Agreement § 5.2(a)(i).

[206] Am. Compl. ¶¶ 197-209.

positions on the Aspen Power Board to circumvent the unanimous consent requirement in Section 5.5(i) of the APP Management LLC Agreement.[207]

The implied covenant involves a "cautious enterprise."[208] It "infer[s] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[209] It cannot be used to "override the express terms of [a] contract."[210] Nor can it be deployed to rewrite a contract to "rebalanc[e] economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[211]

Here, the express terms of the APP Management LLC Agreement preclude the implied covenant claim. The contract makes plain when unanimous consent of APP Management's Class A members is required. Section 5.5 enumerates 15 circumstances requiring unanimous Class A member consent before APP Management—or its "Member" or "Officer"—may cause APP Management to

---

[207] *Id.* ¶¶ 198, 200-03.

[208] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 nn. 30-31 (Del. 2005) (citation omitted).

[209] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

[210] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009); *Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.").

[211] *Nemec*, 991 A.2d at 1128.

act.[212] One such circumstance is "grant[ing] any consent or the waiving or exercising of any rights under the [Aspen Fourth LLC Agreement]."[213]

Because the parties negotiated a comprehensive list of scenarios requiring unanimous consent, there is no contractual gap for the implied covenant to fill. The APP Management LLC Agreement cannot now be "rewrit[ten] . . . to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts[;] the law enforces both."[214] Count IX is therefore dismissed.

## III.  CONCLUSION

For the above reasons, the plaintiffs have stated viable claims in Counts III and VI in the Complaint, albeit narrowly. The only surviving claims are for breach of the Aspen Fourth LLC Agreement regarding the Class B Plaintiffs' preemptive rights and the modification of the MOIC Uplift Schedule. The motion to dismiss is granted as to all other claims, which are dismissed with prejudice.

The parties must confer and submit a proposed form of order implementing this decision within ten days. They must also confer on a proposed schedule to govern the resolution of Counts III and VI.

---

[212] APP Management LLC Agreement § 5.5.

[213] *Id.* § 5.5(i).

[214] *Nemec*, 991 A.2d at 1126.

49